23CA0090 Peo v Anderson 07-09-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0090
Adams County District Court No. 20CR3540
Honorable Priscilla J. Loew, Judge
Honorable Robert W. Kiesnowski, Jr.

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cornelious Anderson,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE MOULTRIE
Grove and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 9, 2026

---

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Cornelious Anderson, appeals the judgment of conviction entered after a jury found him guilty of attempted second degree murder, first degree assault, and attempted aggravated robbery.  We affirm.

## I.     Background

¶ 2     In September 2020, the victim and his girlfriend moved to Colorado and stayed in a motel upon their arrival.  The victim's girlfriend, who was addicted to heroin, arranged to buy some from Anderson, whom she had met the same day that the couple arrived in Colorado.  The victim drove his girlfriend to make purchases directly from Anderson several times, and at least one transaction happened at the motel where the couple was staying.

¶ 3     During one of those meetups, Anderson mentioned that his uncle owned a car dealership, and the victim asked Anderson about purchasing a truck.  Anderson later reached out to the victim to test drive a truck for sale.  The victim test drove the truck for about twenty minutes while Anderson rode along.  After the test drive was complete, the victim agreed to purchase the truck.

¶ 4     The victim and his girlfriend later arranged to meet Anderson at a hospital to finalize the sale of the truck.  But Anderson didn't

show up and, roughly an hour after the scheduled meetup time, told the victim by phone that he wasn't going to make it. So the victim and his girlfriend drove back to their motel.

¶ 5     When they arrived at the motel, the couple was approached by a man — whom they both later identified as Anderson — wearing a wig, a mask, white shoes, and women's clothing. They testified at trial that Anderson drew a gun and demanded money, while firing the weapon into the air twice to "show that he was serious." The victim and his girlfriend fled in different directions, and Anderson chased after the victim. When Anderson caught up to the victim, they started "fighting and grappling each other," which caused Anderson's mask to fall off. After struggling with the victim for a few moments, Anderson shot him twice in the torso. Although he initially began to flee after the shooting, Anderson came back to the

downed victim and started going through his pockets.  Anderson fled again once the victim's girlfriend arrived.

¶ 6     Anderson was later pulled over and arrested in Kansas along with a female companion.  During the arrest, police officers located a black wig and white shoes in his truck.

¶ 7     The prosecution charged Anderson with attempted first degree murder, first degree assault, and attempted aggravated robbery. Anderson defended against the charges by asserting that he was mistakenly identified and suggesting that the woman arrested with him might've been the victim's attacker.

¶ 8     Anderson's first trial resulted in a mistrial after the jury couldn't reach a unanimous verdict.  At the second trial, the jury convicted Anderson of attempted second degree murder, first degree assault, and attempted aggravated robbery.

¶ 9     Anderson contends that the district court reversibly erred by (1) violating his statutory and constitutional speedy trial rights; (2) denying his motion to suppress the victim's photo lineup identification; (3) admitting evidence of an extraction report and location data from his cell phone; and (4) refusing to give his proposed jury instruction on eyewitness identification.  He further

contends that the cumulative effect of these errors deprived him of his right to a fair trial. We reject his contentions in turn.

## II. Speedy Trial

¶ 10 We reject Anderson's first contention because we conclude that Anderson waived his statutory speedy trial right and that the court didn't violate his constitutional speedy trial right.

## A. Additional Background

¶ 11 The key events relevant to Anderson's speedy trial arguments are as follows:

- On October 23, 2020, Anderson was formally charged. Anderson was in custody in Kansas at that time.

- On January 25, 2021, Anderson made his first court appearance for this case.

- On May 20, 2021, Anderson pleaded not guilty. Trial was scheduled to begin on November 1, 2021.

- On October 18, 2021, defense counsel requested a continuance of the November 1, 2021, trial date, and Anderson waived his right to a speedy trial. The speedy trial deadline was therefore extended by six months to

April 18, 2022. Trial was rescheduled to begin on February 7, 2022.

- On January 14, 2022, the prosecution requested a continuance within the existing statutory speedy trial period so its expert witness could testify. Over defense counsel's objection, trial was rescheduled to begin on April 4, 2022.

- On April 4, 2022, trial began as scheduled. On April 11, 2022, the jury indicated that it couldn't reach a unanimous verdict, and the court announced a mistrial.

- On April 18, 2022, the district court held a status conference to schedule a retrial. Defense counsel asked for a trial date in May 2022 because she would be leaving the public defender's office that June. The prosecution objected to a May trial setting, citing concerns about coordinating its out-of-state witnesses. The district court scheduled the retrial to begin on July 18, 2022, the day that the prosecution had calculated to be the statutory speedy trial deadline. Defense counsel objected to this setting on the grounds that it would force Anderson to go

to trial with a different public defender representing him and would likely force him to waive his statutory speedy trial rights again.

- On July 12, 2022, new defense counsel filed a motion to dismiss for violations of Anderson's statutory and constitutional speedy trial rights, asserting that the new speedy trial deadline should have been set on or before July 4, 2022.

- The district court denied the motion in an oral ruling on July 14, 2022.  The court concluded that Anderson's statutory speedy trial right wasn't violated because "Anderson was present when the date was accepted and counsel agreed that speedy trial was on July 18[]."  And after considering the relevant factors, the court concluded that they weighed against finding that Anderson's constitutional speedy trial rights were violated.

- On July 18, 2022, the second trial began as scheduled.

## B.    Standard of Review

¶ 12    We review the district court's denial of a motion to dismiss for a violation of the defendant's speedy trial rights as a mixed question of law and fact. *People v. Curren*, 2014 COA 59M, ¶ 13. We won't disturb the district court's record-supported factual findings underlying its speedy trial decision. *Id.* However, we review de novo the district court's application of those facts to the controlling legal standard. *Id.* We also review de novo whether a defendant's claim is waived. *Richardson v. People*, 2020 CO 46, ¶ 21. And we have an independent, affirmative duty to determine whether a claim is waived, regardless of the parties' positions. *People v. Garcia*, 2025 COA 98, ¶ 8.

## C.    Statutory Speedy Trial

¶ 13    Colorado's speedy trial statute provides that, if a defendant's case "is not brought to trial . . . within six months from the date of the entry of a plea of not guilty, . . . the pending charges shall be dismissed" with prejudice unless the statute provides otherwise. § 18-1-405(1), C.R.S. 2025; *see People v. Sherwood*, 2021 CO 61, ¶ 21. "The burden of compliance with the speedy trial

requirement . . . rests wholly with the People and the trial court."

*Sherwood*, ¶ 23.

¶ 14     However, a defendant may waive their statutory speedy trial right.  As relevant here, section 18-1-405(5.1) states that

> [i]f a trial date is offered by the court to a defendant who is represented by counsel and neither the defendant nor his counsel expressly objects to the offered date *as being beyond the time within which such trial shall be had pursuant to this section,* then the period within which the trial shall be had is extended until such trial date . . . .

(Emphasis added.)  Put differently, "[u]nless the defense makes a speedy trial objection at the time a trial date is offered," they waive the issue.  *People v. Reyes*, 179 P.3d 170, 177 (Colo. App. 2007) (calling section 18-1-405(5.1) a "waiver provision"), *aff'd,* 195 P.3d 662 (Colo. 2008).

¶ 15     Anderson contends that the July 18 retrial was outside the statutory speedy trial period.  Neither party's appellate briefs explicitly address whether section 18-1-405(5.1) applies, and the district court didn't explicitly mention that section when ruling on Anderson's motion to dismiss.  We issued a preargument question asking the parties whether Anderson's claim that his statutory

speedy trial right was violated was foreclosed by section 18-1-405(5.1).

¶ 16    During oral argument, Anderson asserted that the party presentation principle bars us from considering whether section 18-1-405(5.1) applies. "Under that principle, courts 'rely on the parties to frame the issues for decision.'" *People v. Lulei*, 2026 CO 17, ¶ 28 (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). The party presentation principle generally precludes a court from spontaneously deciding an issue that the parties have not raised or had the opportunity to address. *Id.* at ¶ 29. However, the party presentation principle neither prevents a court from properly characterizing an issue that has been improperly characterized by a party, *Lucero v. People*, 2017 CO 49, ¶ 26, nor constrains a court's "fundamental obligation to ascertain controlling law," *Lulei*, ¶ 31.

¶ 17    The People (candidly) acknowledged they didn't explicitly reference section 18-1-405(5.1) in their answer brief; however, they noted their argument that, "to the extent . . . Anderson's claim suggests that the trial court miscalculated the speedy trial deadline after the mistrial, he waived that claim . . . [because] defense

9

counsel agreed the new speedy trial deadline was July 18, 2022." Thus, the People assert that, despite not explicitly referencing section 18-1-405(5.1), they presented an argument based on its rationale. We agree with the People.

¶ 18 The court's ruling implicates section 18-1-405(5.1) by noting that Anderson and his counsel were present at the hearing and agreed to the July 18 deadline, as does the People's argument that, by "agree[ing] that the new speedy trial deadline was July 18," Anderson "waived any claim that the speedy trial date was something else." Moreover, in his reply brief, Anderson acknowledges and directly responds to the People's argument by contending that his "claim that the court improperly tolled speedy . . . is synonymous with saying the court miscalculated the speedy trial deadline." Accordingly, we conclude this issue is properly before us.

¶ 19 Neither Anderson nor defense counsel expressly objected to the July 18 trial setting as being beyond the speedy trial deadline at the time the retrial was set. *See* § 18-1-405(5.1). Indeed, when asked if she disagreed with the People's speedy trial calculation, defense counsel told the court that she didn't. Still, Anderson

argues that his defense counsel's acceptance of the trial date didn't constitute a waiver of his statutory speedy trial right because counsel accepted the date only after her "strident" objections to the offered dates were unsuccessful.

¶ 20    But defense counsel's express objections to the trial date were for reasons unrelated to the statutory speedy trial deadline; thus, they weren't sufficient to defeat the plain language of section 18-1-405(5.1).  *See People v. Franco*, 74 P.3d 357, 359 (Colo. App. 2002) ("Defendant is also mistaken in his assumption that [section] 18-1-405(5.1) is applicable only if the defense explicitly assents to the trial date offered by the court.  By its terms, the waiver provision . . . is applicable in every case unless the defense makes a speedy trial objection at the time a trial date is offered."); *People v. Newton*, 764 P.2d 1182, 1188 (Colo. 1988) ("The obvious purpose of section 18-1-405(5.1) is to impose on the defendant and defense counsel an affirmative obligation to object to a trial setting beyond the speedy trial period . . . .").

¶ 21    Accordingly, we conclude that section 18-1-405(5.1) applies and that Anderson waived his statutory speedy trial rights.  We

therefore don't address the merits of his statutory speedy trial claim.  *See Moody v. Corsentino*, 843 P.2d 1355, 1362 (Colo. 1993).

### D.    Constitutional Speedy Trial

¶ 22    Anderson also contends that the district court and prosecution violated his constitutional right to a speedy trial.  *See People v. Harris*, 914 P.2d 425, 430 (Colo. App. 1995) (the constitutional right to a speedy trial is "distinct from the statutory speedy trial right"). We disagree.

¶ 23    The United States and Colorado Constitutions guarantee all criminal defendants the right to a speedy trial.  *See* U.S. Const. amend. VI; Colo. Const. art. II, § 16.  We apply a four-factor balancing test to assess whether a defendant's constitutional speedy trial rights were violated, considering the following: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right; and (4) the prejudice to the defendant. *Moody*, 843 P.2d at 1363 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)); *see also People v. Chavez*, 779 P.2d 375, 376 (Colo. 1989) (noting the *Barker* test also governs the determination of a speedy trial claim under the Colorado Constitution).  In applying these factors, we must consider "all of the relevant facts."  *Chavez*, 779

12

P.2d at 376. But we need only analyze all four factors if the delay is "presumptively prejudicial." *Moody*, 843 P.2d at 1363-64.

### 1. The Length of the Delay

¶ 24 Although there isn't an "established time period that automatically constitutes undue delay," *id.* at 1364, we deem a delay to be "'presumptively prejudicial,' as it approaches one year," *People v. Cox*, 2023 COA 1, ¶ 44 (quoting *People v. Sandoval-Candelaria*, 2014 CO 21, ¶ 36).

¶ 25 Anderson's constitutional right to a speedy trial attached when the People filed the complaint and information on October 23, 2020. *See Moody*, 843 P.2d at 1363. The retrial began on July 18, 2022, roughly twenty-one months later. Because the delay exceeded one year, it was presumptively prejudicial, and we must therefore analyze the remaining three *Barker* factors.

### 2. The Reason for the Delay

¶ 26 If the defense causes a delay, then that delay "weighs against the defendant." *Vermont v. Brillon*, 556 U.S. 81, 90 (2009); *see People v. Jamerson*, 596 P.2d 764, 768 (Colo. 1979). Further, "a

13

valid reason [for the length of the delay], such as a missing witness, should serve to justify appropriate delay." *Barker*, 407 U.S. at 531.

¶ 27 Anderson was in custody in Kansas from the filing of the charges on October 23, 2020, until his first court appearance on January 25, 2021. Anderson doesn't argue — and there is no evidence — that this approximately three-month delay was attributable to the People.

¶ 28 The preliminary hearing and arraignment were each continued (over the People's objections) at defense counsel's request; these continuances account for approximately three months of the delay. *See Jamerson*, 596 P.2d at 768; *see also* § 18-1-405(6)(f) (delays to accommodate defense counsel are attributable to the defendant). Additionally, Anderson requested a continuance of the initial trial date and made a limited waiver of his statutory speedy trial right, resulting in a further delay of about three months. In contrast, the People asked for a single continuance within the new statutory speedy trial period to facilitate an expert witness's attendance at trial, which accounts for about two months of the delay.

¶ 29 Assuming without deciding that Anderson is correct in asserting that the second trial should've been set in May 2022 when

defense counsel was available for trial, the initial mistrial still serves as a valid and justifiable reason for one and a half months of the delay. *See Barker*, 407 U.S. at 531. And assuming any delay beyond May 2022 was attributable to the People,[1] the prosecution is responsible for a total of around four months of delay — less than the approximately six months attributable to Anderson.

¶ 30    To summarize, most of the twenty-one months between the filing of charges and the start of Anderson's second trial can be accounted for as follows: The approximately three months that Anderson was in custody in Kansas aren't attributable to the People or to Anderson; at least six months are attributable to Anderson based on his requests for continuances; at least one-and-a-half months are justifiable because of the mistrial; and, at most, four months are attributable to the People (with two of those months falling within Anderson's statutory speedy trial waiver). Thus, we

---

[1] We note that defense counsel wasn't available for a trial setting in most of June 2022.

conclude that the reasons for the delay don't weigh in favor of finding a constitutional speedy trial violation.

### 3. Anderson's Assertion of His Speedy Trial Right

¶ 31    Anderson asserted his right to a speedy trial through his motion to dismiss and raised concerns about speedy trial in various pretrial hearings.  But he also requested multiple continuances and voluntarily made a limited waiver of his statutory speedy trial right.  This factor weighs slightly in favor of a constitutional speedy trial violation.

### 4. Prejudice to Anderson

¶ 32    When assessing prejudice to the defendant, we focus on three interests: "(1) preventing oppressive pretrial incarceration; (2) minimizing the accused's anxiety and concern; and (3) limiting the possibility the defense will be impaired."  *People v. Nelson*, 2014 COA 165, ¶ 36.  While all three interests are important to our analysis, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  *Id.* (quoting *Barker*, 407 U.S. at 532).

¶ 33    As to the first factor, Anderson notes that he was in custody during the entire pretrial period, but he doesn't present an

argument that he experienced "oppressive pretrial incarceration."

As to the second, although we recognize that a lengthy pretrial delay may generate anxiety, Anderson offered no explanation of how the delay caused him any greater anxiety or concern than felt by the average defendant.

¶ 34    Instead, he focuses on the third factor, arguing that the lengthy delay between the filing of charges and his second trial prejudiced his defense because witnesses' memories might have faded, and his court-appointed counsel left the public defender's office and wasn't able to represent him at the second trial.

¶ 35    But witnesses testified during the first trial, which occurred during the timeframe covered by Anderson's waiver of his statutory speedy trial right.  The second trial occurred three months after the first.  Anderson's new defense counsel therefore had three months to prepare for the retrial.  For two of those months, his original defense counsel was still a member of the public defender's office, and there is no indication that she wasn't still assigned to the case or otherwise unable to assist his new counsel.

¶ 36    Thus, we disagree with Anderson that the prejudice to him is self-evident.  And "prejudice to the defendant cannot be presumed

solely from the length of delay, nor by unsupported allegations of such prejudice." *Jamerson*, 596 P.2d at 768. Accordingly, we conclude that Anderson hasn't demonstrated that he was prejudiced by the trial delay.

¶ 37 Although the length of delay and Anderson's assertion of his speedy trial right weigh in favor of finding a speedy trial violation, these factors are outweighed by the reasons for the delay and the lack of prejudice to Anderson. Therefore, we reject Anderson's contention that his constitutional right to a speedy trial was violated. *See Chavez*, 779 P.2d at 376 (noting that it's the defendant's burden to demonstrate a speedy trial violation).

### III. The Photo Lineup

¶ 38 Anderson argues that the district court erred by denying his motion to suppress the victim's photo lineup identification. We disagree.

#### A. Applicable Law and Standard of Review

¶ 39 A court violates a defendant's constitutional right to due process if it allows a jury to consider evidence of an unreliable out-of-court identification. *See People v. Borghesi*, 66 P.3d 93, 103

(Colo. 2003).  To determine whether a pretrial photo identification is admissible, courts apply a two-part test.  *Id.*

¶ 40     First, the defendant must show that the photo lineup was impermissibly suggestive.  *Id.*  Relevant factors include the number of photos in the lineup, the manner of presentation by police, and the details of the photographs themselves.  *Id.* at 103-04.  The photos should be "matched by race, approximate age, facial hair, and a number of other characteristics."  *Bernal v. People*, 44 P.3d 184, 191-92 (Colo. 2002) (citation omitted).

¶ 41     Second, if a court finds that the photo lineup was impermissibly suggestive, the prosecution must show that the witness's identification was nevertheless reliable under the totality of the circumstances.  *Borghesi*, 66 P.3d at 103.

¶ 42     While the district court's factual findings are entitled to deference, *id.* at 104, when the photo lineup is part of the court record, we are in the same position as the district court to review the details of the photographs and determine, de novo, whether the

photo lineup itself was impermissibly suggestive, *People v. Shanks*, 2019 COA 160, ¶ 50.

### B. The Photo Lineup Wasn't Impermissibly Suggestive

¶ 43 Anderson contends that the photo lineup was impermissibly suggestive because (1) the photographs didn't align with the victim's description of the shooter, and (2) Anderson was the only person in the lineup who was smiling broadly and who had a visible gap between his front teeth. For three reasons, we aren't persuaded.

¶ 44 First, Anderson provides no authority to support his assertion that the photo lineup is impermissibly suggestive because the detective also considered the victim's girlfriend's description of the perpetrator when assembling it. Rather, the key question is "whether the picture of the accused, which matches descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that that person was more likely to be the culprit." *Bernal*, 44 P.3d at 191 (citation modified).

¶ 45 Second, the victim described the perpetrator as a "[B]lack male" who was "pretty well built" and "looked like Adrian

Peterson."[2]  At the suppression hearing, the court took judicial notice of the fact that Adrian Peterson is a former college and professional football player who is "relatively famous."  Indeed, defense counsel asked the court to further judicially notice that Adrian Peterson was "a runner up his freshman year to a Heisman trophy, seventh overall draft pick, [and] set a rookie record his first year"; played for several professional teams; and "was widely considered to be one of the best running backs in football history."

¶ 46    Given this record, we disagree with Anderson that "this description was so subjective that it failed to provide meaningful parameters."  The mere fact that the victim's description didn't specify the "version of [Adrian] Peterson" — that is, the college or professional athlete, or the Minnesota Vikings or Detroit Lions player — to which the victim was referring doesn't render the photo lineup impermissibly suggestive.  *Cf. Shanks*, ¶ 51 (concluding that

---

[2] Adrian Peterson is a retired American football player.  *See* Kevin Seifert, *Vikings to induct ex-RB Adrian Peterson into ring of honor*, ESPN, https://perma.cc/9948-GS4P.

a photo lineup based on the victim's description of the defendant as a "[B]lack Abe Lincoln" was admissible).

¶ 47     Instead, we agree with the district court that Anderson and the others depicted in the photo lineup bear some resemblance to Adrian Peterson.  And all six people appear to be of similar age and ethnicity, with similar eye color and skin tone, and all were either bald or had very short hair.  While there are clearly some dissimilarities, officers aren't required to provide a photo array that contains only "exact replicas" of the defendant's — or, in this case, Adrian Peterson's — photo; rather, all that is required is that the "photos are matched by race, approximate age, facial hair, and a number of other characteristics."  *Bernal*, 44 P.3d at 191-92 (quoting *People v. Webster*, 987 P.2d 836, 839 (Colo. App. 1998)).

¶ 48     Third, the fact that Anderson is smiling broadly and has a gap between his front teeth in his photo doesn't make it stand out from the other five photos in a way that indicates that he was more likely to be the perpetrator.  *See id.* at 191.  Four of the people in the

photos weren't smiling, so there's no way the victim could've known whether they had a gap between their teeth or not.

¶ 49 More importantly, the victim didn't include a gap between the shooter's front teeth or the shooter's smile in his description to the detective, so those features aren't defining characteristics that create impermissible suggestiveness. *See Shanks*, ¶ 52. Though the victim described the perpetrator's personality as "being able to sell anybody anything," nothing about that statement suggests that the perpetrator would be smiling in a photo lineup. And we reject as speculative Anderson's assertion that the victim's girlfriend must have told the victim about the gap in Anderson's teeth sometime after the victim gave the detective a description but before reviewing the photo lineup.

¶ 50 We therefore conclude, like the district court, that the photo lineup wasn't impermissibly suggestive. And because Anderson failed to meet his burden on the first step of the analysis, we don't need to consider whether the identification was otherwise reliable under the second step. Thus, the district court didn't err by

admitting evidence of the victim's out-of-court photo identification of Anderson.

## IV. Cell Phone Extraction Report and Location Data

¶ 51 Anderson contends that the district court abused its discretion by admitting evidence of his cell phone's contents and location data. Specifically, he argues that the court admitted inadmissible hearsay through (1) testimony about an unadmitted report of files extracted from his cell phone; (2) testimony about unadmitted location data received from the cell phone service provider; and (3) maps created from that location data by an expert witness. We discern no reversible error in the admission of this evidence.

### A. Additional Background

¶ 52 At trial, the prosecution presented evidence about the extraction report and location data through two police detectives. The first, Detective Ian Ranshaw, testified that he sent Anderson's cell phone to a specialized police task force to extract its contents and later received an extraction report from them. The extraction report itself wasn't admitted into evidence, but Detective Ranshaw testified about its contents. He explained that several applications on the phone were logged into user accounts under the name

"Cornelius Anderson"[3] and that the phone's Google search history showed the user had been looking up details about a shooting at the victim's motel days after the shooting occurred.  He further explained that he didn't see any evidence in the extraction report that would suggest that the woman arrested with Anderson in Kansas was the shooter.

¶ 53   Detective Ranshaw also testified that he subpoenaed the phone's location data from the cell phone service provider and then provided that data to the second police detective, Detective Tonya DiGiacomo, for analysis.  The prosecution didn't move to admit the location data itself but instead asserted that, as an expert witness, Detective DiGiacomo was allowed to testify about the data and the maps she created from it under CRE 703.  The district court agreed.

¶ 54   Defense counsel didn't object, and the court qualified Detective DiGiacomo as an expert in cell phone data analysis.  She testified that she uploaded the cell phone location data into a software program that created a map animation of where the phone was on the day of the shooting, and her maps were several still

---

[3] This is how the name is spelled in the transcript.

shots taken from that animation. Over defense counsel's objection, the maps were admitted into evidence. Detective DiGiacomo then explained how the maps demonstrated which cell phone towers the phone was connected to at various times; one map showed that the phone was connected to a tower near the shooting as it occurred.

B. Applicable Law and Standard of Review

¶ 55 Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). A declarant is "a person who makes a statement." CRE 801(b). A "statement" is either "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person to be communicative." CRE 801(a). Hearsay is inadmissible except as provided by the rules of evidence or other applicable statutes or rules. CRE 802; *People v. Buckner*, 228 P.3d 245, 249 (Colo. App. 2009).

¶ 56 When a statement contains multiple layers of hearsay, we must analyze each layer separately to determine if any include inadmissible hearsay. *See People v. Abad*, 2021 COA 6, ¶ 59. "Hearsay included within hearsay is not excluded under the

hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule." *Id.*

¶ 57 We review the district court's evidentiary rulings for an abuse of discretion. *People v. Dominguez*, 2019 COA 78, ¶ 13. The court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or is contrary to law. *Id.* We review de novo the court's decision on whether statements are hearsay. *People v. Hamilton*, 2019 COA 101, ¶ 12.

¶ 58 The People concede that Anderson preserved his hearsay objection to testimony about the extraction of data from his cell phone. We therefore review the district court's admission of that testimony for harmless error. *See People v. Rodriguez*, 2022 COA 11, ¶ 13. But he objected to the location data and the maps created therefrom on foundation, authentication, and relevancy grounds, not because they were inadmissible hearsay. We therefore review the court's admission of that testimony for plain error. *See People v. Allgier*, 2018 COA 122, ¶ 30. "An error is plain where it is obvious and substantial, and casts serious doubt on 'the basic fairness of the trial itself' and 'the reliability of the judgment of

conviction.'" *Id.* (quoting *Wilson v. People*, 743 P.2d 415, 419-20 (Colo. 1987)).

## C. Testimony About the Extraction Report Wasn't Hearsay

¶ 59 Anderson contends that Detective Ranshaw's testimony about the data extracted from the cell phone was inadmissible hearsay because the extraction report itself was inadmissible hearsay.[4] But information automatically generated by machines isn't hearsay because no "person" or "declarant" made a "statement" within the meaning of CRE 801. *Buckner*, 228 P.3d at 250; *see Abad*, ¶ 54.

¶ 60 The detective who performed the extraction of Anderson's cell phone data testified that a software program he used "extract[ed] all of the files" from Anderson's phone before a different software program "ingest[ed] those files and produce[d] a report that [was] easier for a detective to go through." This testimony established that the extraction report was generated by computer software

---

[4] Anderson doesn't argue that the contents of the phone that Detective Ranshaw described — account user information and Google search history — were inadmissible hearsay. *See People v. Abad*, 2021 COA 6, ¶¶ 63-64 (holding that device user information and testimony about a YouTube search on a phone were nonhearsay statements by a party opponent under CRE 801(d)(2)(A)).

without human input or interpretation. And because the extraction report was generated by a machine, the report itself is not a "statement" made by a "declarant" and therefore not hearsay. *See Buckner*, 228 P.3d at 250; *Abad*, ¶ 56.

¶ 61 Because the extraction report itself wasn't hearsay, it follows that Detective Ranshaw's testimony about it wasn't hearsay. *See Abad*, ¶ 58; CRE 801(c). Thus, we conclude that the district court didn't err by admitting Ranshaw's testimony over defense counsel's objection. *See People v. Marquez*, 2020 COA 169M, ¶ 3 (an appellate court may affirm on any record-supported basis).

### D. The District Court Erred by Admitting Testimony About the Cell Phone's Location Data and the Maps Created Therefrom, but the Error Wasn't Plain

¶ 62 Anderson also argues that the court reversibly erred by allowing Detective DiGiacomo's testimony about his cell phone's location data and the maps that she created from that information because her testimony was based on unadmitted cell phone records. We agree that the court erred, but we conclude the error wasn't plain.

¶ 63 "Testimony about the contents of a public or business record is admissible only when the record itself is introduced; otherwise,

29

the witness's testimony is inadmissible hearsay." *People v. Vigil*, 2024 COA 72, ¶ 33. But the prosecution chose not to admit into evidence the cell phone records underlying Detective DiGiacomo's testimony. Thus, Detective DiGiacomo's maps were simply repackaged forms of this inadmissible hearsay. *See Hamilton*, ¶ 30 (detective's testimony about reports reflecting the contents of cell phones was a "second layer of hearsay" to which the detective couldn't testify, even if the reports themselves were admissible).

¶ 64 Nevertheless, the district court — at the prosecution's urging — allowed Detective DiGiacomo to testify about the location data and her maps under CRE 703, which provides that an expert's opinion is admissible even if the expert relied on inadmissible data to form it. But that rule also clearly says that data that is "otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference" unless the court determines that the probative value of the data substantially outweighs its prejudicial effect. CRE 703. The district court didn't make such a determination. Thus, the court's admission of Detective DiGiacomo's testimony was obvious error because her testimony was based on inadmissible hearsay unsupported by a

determination that its probative value was substantially outweighed by its prejudicial effect.

¶ 65 The People don't attempt to defend the admission of the location data and maps under CRE 703. Instead, the People assert that, like the extraction report, the location data and maps aren't hearsay because they were generated by a machine. We aren't persuaded.

¶ 66 The People argue that "nothing in the record suggest[s] that human input or interpretation was involved in creating [the location data]." But "[t]he proponent of the evidence bears the burden of establishing a hearsay exception." *People v. Vanderpauye*, 2023 CO 42, ¶ 25. And the prosecution didn't provide any testimony or other evidence to establish that the cell phone provider's compilation of the location data didn't involve human input or interpretation. *See Hamilton*, ¶ 26.

¶ 67 Nonetheless, we conclude that the court's error in allowing Detective DiGiacomo's testimony doesn't cast serious doubt on the basic fairness of the trial or the reliability of the judgment. *See*

*Allgier*, ¶ 30.  The evidence presented to the jury included the

following:

- The victim and his girlfriend both testified that the

  shooter, despite being dressed as a woman, was a man

  who, at one point, spoke in a deep voice.  A person

  staying at the hotel who saw part of the altercation (but

  not the shooting itself) also testified that the shooter was

  a man with a deep voice.  Both the victim and his

  girlfriend identified the perpetrator as Anderson.

- Anderson knew the victim would have money on him to

  pay for the truck, failed to show up at the meeting place

  to sell the truck, and knew where the victim and his

  girlfriend were staying because he'd sold heroin to the

  victim's girlfriend at the motel before.  The shooter waited

  in the motel parking lot for the victim, approached the

  victim and his girlfriend as soon as they arrived, and

  rooted through the victim's pockets after shooting him.

- Surveillance camera video showed the shooter wearing a

  black wig and white shoes; police officers found a similar

looking wig and shoes in Anderson's truck when they

arrested him in Kansas.

Thus, we conclude that the evidence that the shooter was Anderson

was overwhelming. *See People v. Martinez*, 2020 COA 141, ¶ 76 (an

error doesn't normally constitute plain error when the record

contains overwhelming evidence of the defendant's guilt).

### V.     Eyewitness Jury Instruction

¶ 68     Anderson contends that the district court erred by denying his

tendered instruction on eyewitness identification. We disagree.

### A.     Standard of Review and Applicable Law

¶ 69     We review jury instructions de novo to determine whether they

accurately inform the jury of the governing law. *People v.*

*Theus-Roberts*, 2015 COA 32, ¶ 18. If they do, then the district

court has substantial discretion in formulating the instructions and

deciding whether any additional instructions are needed. *Id.*

Therefore, we review the court's decision to give or not give a

particular jury instruction for an abuse of discretion. *People v. Jones*, 2023 COA 104, ¶ 16.

### B. The District Court Didn't Err by Rejecting Anderson's Instruction

¶ 70     Anderson tendered a *Telfaire*-type instruction — that is, a jury instruction that provides guidance on evaluating the reliability of eyewitness identification testimony. *See United States v. Telfaire*, 469 F.2d 552, 558-59 (D.C. Cir. 1972) (providing a model special instruction on identification). The district court declined to give his instruction, instead providing only the pattern jury instruction on witness credibility.

¶ 71     Anderson acknowledges that the "Colorado Supreme Court has consistently held that it is not error for a trial court to refuse tendered *Telfaire* instructions when the jury receives a general instruction on the credibility of witnesses." *Theus-Roberts*, ¶ 19; *see also People v. Alexander*, 797 P.2d 1250, 1259 (Colo. 1990) ("It is not error for the trial court to refuse a specific instruction on the credibility of eyewitnesses where the trial court gives a general instruction on the credibility of witnesses."). Nevertheless, he asks us to depart from this precedent because, since the time of these

cases, scientific research has shown that eyewitness identifications are often unreliable, yet jurors tend to accord them more weight than other evidence.  *See Theus-Roberts*, ¶¶ 42-44 (Berger, J., specially concurring) (summarizing the scientific research on these issues).

¶ 72      But we're "bound to follow supreme court decisions unless they have been overruled or abrogated."  *People v. Kern*, 2020 COA 96, ¶ 42.

¶ 73      Accordingly, we reject Anderson's contention that the court erred by declining to provide the jury with his proposed misidentification instruction.  We also conclude that Anderson was able to adequately convey his misidentification theory of defense through the pattern instruction on witness credibility and his counsel's closing argument.  *See Shanks*, ¶ 68 (the jury had sufficient evidence and argument to understand the defendant's mistaken identity theory of defense).

## VI.   Cumulative Error

¶ 74      Finally, Anderson argues that reversal is warranted under the cumulative error doctrine.  However, because we've identified only one error, we need not conduct a cumulative error analysis.  *See*

*People v. Conyac*, 2014 COA 8M, ¶ 152 ("The doctrine of cumulative error requires that numerous errors be committed, not merely alleged.").

## VII.   Disposition

¶ 75   We affirm the judgment.

JUDGE GROVE and JUDGE GOMEZ concur.